UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL LOUIS CRISTINI,

                    Plaintiff,

                                             Case No. 07-11141

v.                                     Honorable David M. Lawson

CITY OF WARREN, WARREN POLICE
DEPARTMENT, ALAN WARNICK,
ALICE INGLES as guardian for Donald
Ingles, and JOHN DOE members of Warren
Police Department and Office of the Prosecutor,

                    Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

      The plaintiff in this case has filed an action that parallels an earlier case filed by Jeffrey

Moldowan, contending that he was wrongfully prosecuted and convicted of a brutal kidnapping and

rape by authorities that withheld evidence that was material to his innocence. Moldowan's case was

settled and dismissed earlier this year. Following his subsequent acquittal, plaintiff Michael Cristini

sued the defendants alleging violations of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights

under 42 U.S.C. § 1983 because defendants the City of Warren, the Warren Police Department, and

Donald Ingles allegedly withheld exculpatory evidence in the underlying trial at which he was

convicted and destroyed evidence in violation of a court order. The plaintiff also brings claims of

detention and prosecution without probable cause under the Fourth and Fourteenth Amendment

against the City of Warren, the Warren Police Department, the Macomb County Prosecutor, and

Macomb County. The defendants in this case have filed their respective motions for summary

judgment, raising many of the same arguments interposed in the Moldowan lawsuit, plus an

additional defense based on the statute of limitations.  The Court heard oral argument on January 12, 2012.  Since then, the Macomb County defendants have resolved their part of the case and have been dismissed as parties.  Their motion for summary judgment will be dismissed as moot.  As to the remaining motions, the Court now concludes that the plaintiff has offered sufficient evidence to allow him to proceed against defendants Donald Ingles and the City of Warren on counts IX, X, XI, XII, and XXII, of the complaint, but the defendants are entitled to a judgment as a matter of law on the remaining counts.  Therefore, the Court will grant in part and deny in part the motions for summary judgment.

I.

As mentioned, this case arises from the same facts that spawned the Moldowan lawsuit, which was adjudicated on interlocutory appeal by the Sixth Circuit.  *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009).

A.  Events leading to the plaintiff's original conviction

As explained in that opinion and in other filings by this Court, the events underlying this lawsuit began on the morning of August 9, 1990 when Emergency Medical Services found Maureen Fournier injured and lying in the street in Detroit.  In preliminary interviews, Fournier reported that she was abducted from Warren, Michigan and assaulted by four white males: Michael Cristini (the plaintiff in the present action), Jim Cristini, Tracy Tapp, and Jeffrey Moldowan, all of whom she knew.

At the preliminary examination on September 17 and 18, 1990, Fournier and her sister, Colleen Corcoran, testified that Moldowan had dated Fournier previously and had been abusive and threatening toward her.  Corcoran stated that on August 8, 1990 Moldowan called her house looking

-2-

for Fournier and told her that "he was going to get [Fournier]." Fournier testified that on the evening of August 8 she was walking on 11 Mile Road in Warren when a van pulled alongside her. Moldowan allegedly got out of the van, grabbed her, and dragged her into the van, where she was beaten and raped. Corcoran testified that she received a call the following day from an anonymous male she immediately identified as Moldowan asking about Fournier's whereabouts. Although she knew that Fournier was in the hospital, Corcoran told the caller that her sister was at home, to which the caller allegedly replied, "No, she's not. . . . She's at the morgue." Following the preliminary examination, only the plaintiff and Moldowan were bound over for trial and remained as defendants in the case.

The first jury trial took place from April 30 to May 10, 1991. Dr. Alan Warnick, a forensic odentologist and consultant for the Medical Examiner's offices in Wayne County, Macomb County, and Monroe County, and the Michigan State Police, offered expert testimony at the trial that bite marks on Fournier's neck were consistent with Moldowan's dentition, while bite marks on Fournier's right arm and right side were consistent with the plaintiff's dentition. Dr. Warnick testified that the chances were "2.1 billion to 1 that another individual [made] those same marks," and his testimony was corroborated by his colleague Pamela Hammel, D.D.S. The plaintiff's own forensic odentologists countered Dr. Warnick's testimony regarding the bite mark evidence. The plaintiff and Moldowan also offered testimony from alibi witnesses. The jury convicted the plaintiff and Moldowan of kidnapping, assault with intent to commit murder, and two counts of criminal sexual conduct in the first degree. The plaintiff was sentenced to four concurrent prison terms of 50 to 75 years.

B.  Subsequent evidentiary findings

Following the first trial, Moldowan's family hired a private investigator who located Jerry Burroughs.  Burroughs reported that when he left his mother's home on the morning of August 9, 1990, he saw four black males standing around and kicking a naked white female lying in the street before they drove away in a light-colored van.  He further testified that one week following the incident he heard two of the men, Chris and Mitch, talking about the incident and bragging that they had participated.  The plaintiff alleges that defendant Ingles and the Warren Police Department knew of this evidence and withheld it from him and Moldowan during the first trial.

After being approached by Moldowan's appellate counsel, Dr. Hammel recanted her 1991 trial testimony regarding the bite marks on Ms. Fournier's body.  She stated that when she originally reviewed the evidence in 1991 she had difficulty matching the bite marks to Moldowan's dentition, but that Dr. Warnick had reassured her that Dr. Norman Sperber, a highly respected forensic odontologist, had reviewed the evidence and confirmed Dr. Warnick's conclusions.  In a sworn affidavit, Dr. Hammel stated that, had she known that Dr. Warnick's representation that Dr. Sperber had reviewed the evidence was untrue, she "would never have agreed to testify as a rebuttal witness in support of Dr. Warnick's conclusions."

After the first trial, the Macomb County circuit court entered an order requiring that all evidence in the custody of the Warren Police Department, the Macomb County Prosecutor's Office and the Macomb County circuit court be preserved until further order of the court.  Despite that order, Officer Michael Schultz of the Warren Police Department destroyed the evidence in the police department's custody at some point after the plaintiff's first trial and before the plaintiff's second trial.  The evidence that was destroyed included hairs, blood samples, bite impressions, a "spike",

-4-

a jacket, pizza order tickets, a video tape, nail scrapings, and shoes.  A Michigan State Police Laboratory report indicated that the nail scrapings did not have  immediate evidentiary value and that the hairs were dog and cat hairs.

### C.  The Plaintiff's Acquittal

On May 15, 2002, the Michigan Supreme Court reversed Moldowan's conviction, concluding that because of the new alibi witness, Burroughs, and the fact that the prosecution's expert witnesses had either recanted their testimony regarding the bite mark evidence or had been discredited, a new trial was warranted.  *People v. Moldowan*, 466 Mich. 862, 643 N.W.2d 570 (2002).  After the Michigan Supreme Court reversed Moldowan's conviction, the Macomb County prosecutor retried Moldowan beginning on January 10, 2003.  On February 12, 2003, the jury acquitted him of all criminal charges.

After Molodowan's acquittal, the Macomb County circuit court granted the plaintiff's motion for relief from judgment on October 20, 2003, vacating the plaintiff's convictions and ordering a new trial.  The plaintiff was released on bond and remained under house arrest throughout the trial. The plaintiff's retrial commenced on March 16, 2004, and the plaintiff was acquitted on April 8, 2004.

### D.  The Moldowan Civil Action

In January 2005, Moldowan filed suit in this Court, alleging under 42 U.S.C. § 1983 that his rights guaranteed by the Fourth, Fifth, Sixth, and Fourteenth Amendment and Michigan law were violated by his arrest, criminal prosecution, conviction, and retrial in the Fournier case.  The case was assigned to the Honorable Anna Diggs Taylor.  The theory behind the complaint was that the City of Warren, the Warren Police Department, Macomb County, the Macomb County prosecutor,

Dr. Alan Warnick, Warren Police Detective Donald Ingles, Warren Police Officer Mark Christian, and Fournier acted separately and conspired together to violate the plaintiff's civil rights by fabricating evidence against him, failing to disclose exculpatory evidence, and pursuing his prosecution and retrial without probable cause. The claims in Moldowan's case are similar, although not identical, to those in the present case.

In April 2007, the defendants in the Moldowan action filed motions for summary judgment raising issues similar to those raised here. The Warren defendants argued that defendant Ingles was entitled to qualified immunity, that a *Brady* duty had not been extended to police officers, that there was no evidence of a pertinent policy or custom to support municipal liability, and that probable cause existed to try Moldowan. Macomb County and the Macomb County prosecutor filed a motion for summary judgment arguing that there was probable cause for Moldowan's prosecution and that the plaintiff's substantive and procedural due process claims were subsumed by his Fourth Amendment claims. Moldowan also moved for partial summary judgment as to his *Brady* claims against defendant Ingles. Judge Taylor granted the Warren defendants' motion for summary judgment with respect to their contention that the Warren Police Department was not an entity capable of being sued and denied it on all other grounds. Judge Taylor also denied the Macomb defendants' and Moldowan's motions for summary judgment.

The Warren defendants appealed the district court's denial of qualified immunity, and the Sixth Circuit affirmed in part and reversed in part the district court's decision. *See Moldowan*, 578 F.3d at 351. Moldowan's surviving claims were that defendant Ingles violated the Fourth, Fifth, Sixth, and Fourteenth Amendments by withholding exculpatory evidence and committed gross negligence in connection with his role in the 1990 investigation; that the City of Warren and the

-6-

Warren Police Department were liable for failing to properly train their police force and for destroying evidence in violation of a court order; and that the Warren Police Department, the City of Warren, the Macomb County Prosecutor, and Macomb County falsely imprisoned the plaintiff without probable cause in connection with the second prosecution. The case was settled and closed on November 1, 2011.

### E.  The plaintiff's lawsuit

On March 15, 2007, the plaintiff filed a 29-count complaint against the City of Warren, the Warren Police Department, Macomb County, the Macomb County prosecutor, Alan Warnick, Donald Ingles, Michael Schultz, and Maureen Fournier. On January 14, 2011, all claims against defendant Fournier were dropped. Discovery has been completed. Presently before the Court are motions for summary judgment filed by defendants Donald Ingles, Michael Schultz, the City of Warren, and the Warren Police Department (the "Warren defendants"), defendants the Macomb County Prosecutor and the County of Macomb, and defendant Alan Warnick. On November 7, 2011, the parties stipulated to dismiss all claims against Schultz and certain claims against the City of Warren, the Warren Police Department, and Ingles. Defendant Donald Ingles was replaced as a defendant by his guardian, Alice Ingles, on December 1, 2011. The Court was notified of Mr. Ingles's death on May 4, 2012, and there is currently pending before the Court a motion to substitute the personal representative of his estate as a defendant. As mentioned, the Macomb defendants have resolved their part of the case and a dismissal order was entered. In addition, the parties presented an order pertaining to negotiations of settlement checks from Dr. Warnick, which implies that he settled his part of the case, although the parties have not formally notified the Court of the settlement or presented a stipulation for dismissal. Nonetheless, the Court will assume the claims against Dr.

-7-

Warnick have been resolved and will dismiss his motion for summary judgment as moot. Finally, the Warren defendants and the plaintiff have agreed to dismiss several counts of the complaint, some of which are the subject of the pending summary judgment motions. The following counts remain: (1) against defendant Ingles: violation of the plaintiff's Fourth Amendment rights through failure to disclose exculpatory evidence (count IX); violation of the plaintiff's Fifth and Sixth Amendment rights through failure to disclose exculpatory evidence (count X); violation of the plaintiff's right to substantive due process under the Fourteenth Amendment through failure to disclose exculpatory evidence (count XI); and violation of the plaintiff's right to procedural due process under the Fourteenth Amendment through failure to disclose exculpatory evidence (count XII); and (2) against defendants the City of Warren and the Warren Police Department: failure to train and supervise police officers regarding the constitutional rights of citizens (count XXII); liability for the actions of defendant Ingles as final policymaker (count XXIII); and liability for the destruction of evidence in violation of a court order (count XXIV); continued seizure during the second trial in violation of the Fourth Amendment (count XXV); continued seizure during the second trial in violation of the Fourteenth Amendment right to substantive due process (count XXVI); and continued seizure during the second trial in violation of the Fourteenth Amendment right to procedural due process (count XXVII).

II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Sixth Circuit has explained:

> Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56(a), (b). Such a

-8-

motion presumes the absence of a genuine issue of material fact for trial. The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find

for the [opposing party]." *Highland Capital, Inc.*, 350 F.3d at 546 (quoting *Anderson*, 477 U.S. at 251-52) (internal quotation marks omitted).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248).

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

### A.  Claims against Warren Police Department

The Warren defendants assert that all claims against the Warren Police Department — counts XXII through XXVII of the plaintiff's complaint — must be dismissed because the Warren Police Department is not an entity capable of being sued. Under Michigan law, a police department is an agency of the city, and is not a discrete entity that can be sued. *See Boykin v. Van Buren Tp.*, 479 F.3d 444, 450 (6th Cir. 2007); *Laise v. City of Utica*, 970 F. Supp. 605, 608 (E.D. Mich. 1997); *Pierzynowski v. Police Dept. City of Detroit*, 941 F. Supp. 633, 637 n.4 (E.D. Mich. 1996) (construing a complaint naming the City of Detroit Police Department as a defendant as naming the

-10-

City of Detroit because the Detroit Police Department is not an entity that can be sued); *Haverstick Enterprises, Inc. v. Financial Federal Credit, Inc.*, 803 F. Supp. 1251, 1256 (E.D. Mich. 1992); *see also* Mich. Comp. Laws § 92.1 ("The council of any city may provide, by ordinance, for a police force . . . ."). The plaintiff has not rebutted the Warren defendants' argument, nor has it provided any case law that conflicts with the cases cited above. The Court agrees with the defendants' argument and will grant the Warren defendants' motion for summary judgment with respect to the plaintiff's claims against defendant the Warren Police Department.

### B.  Qualified immunity

Defendant Ingles argues that he is entitled to qualified immunity on the claims against him. The plaintiff contends that Ingles violated his clearly established constitutional rights by not disclosing exculpatory evidence, and Ingles is collaterally estopped from raising that defense by the Sixth Circuit's decision in the Moldowan interlocutory appeal.

### 1.

The Court will address the second argument first. In response to the claim of collateral estoppel, Ingles replies that the parties in *Moldowan* were different and that no question of fact was fully and finally litigated, and thus collateral estoppel does not apply.

Where the judgment that a party looks to for preclusion is a federal court judgment, the Court must "look to federal law to determine its preclusive effect." *Hamilton's Bogarts v. Michigan*, 501 F.3d 644, 650 (6th Cir. 2007); *see also EB-Bran Productions v. Warner*, 242 F. App'x 311, 312 (6th Cir. 2007) ("[A] federal court applies *federal* law in determining the preclusive effect of a prior federal judgement . . . at least where jurisdiction in the prior litigation was based on a federal

-11-

1question.").   The Sixth Circuit has listed four requirements for the application of collateral estoppel:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Hamilton's Bogarts*, 501 F.3d at 650 (quoting *NAACP, Detroit Branch v. Detroit Police Officers Ass'n (DPOA)*, 821 F.2d 328, 330 (6th Cir. 1987)).   Ingles's protestations that the *Moldowan* decision did not fully and finally litigate a question of fact and that the parties are not the same are beside the point, because those are requirements for collateral estoppel under Michigan law, which does not apply in this case.   *See Gilbert v. Ferry*, 413 F.3d 578, 580-81 (6th Cir. 2005) (listing the requirements for collateral estoppel under Michigan law).

The only issues Ingles raises that address the requirements for collateral estoppel are the questions of law as to the plaintiff's *Brady* claim against defendant him: that is, whether *Brady* applies to police officers and whether defendant Ingles is entitled to qualified immunity.   The Court believes that the decision in *Moldowan* estops Ingles from advancing those defenses here.

Ingles summarily argues that no section 1983 action may be maintained against a police officer for failure to submit exculpatory information to the prosecutor.   He also argues that he would be entitled to qualified immunity as to any *Brady* violations.   But in *Moldowan*, the Sixth Circuit ruled against him on both counts.   It held that the plaintiff may maintain a section 1983 action against a police officer for failure to submit exculpatory information to prosecutors, that right was clearly established on the date of its alleged violation by Ingles, and therefore Ingles was not entitled to qualified immunity on the plaintiff's *Brady* claims.   *Moldowan*, 578 F.3d at 381-82.   Those

-12-

precise issues were raised and actually litigated in the *Moldowan* case, satisfying the first requirement for collateral estoppel. Moreover, the determination on those issues was both necessary to the outcome and a final decision on the merits, satisfying the second and third requirements. Had the Sixth Circuit held differently on any of those issues, it would have been required to grant Ingles' motion for summary judgment on the plaintiff's *Brady* claims, either because the plaintiff had no claim against Ingles or because Ingles was entitled to qualified immunity. The Sixth Circuit's ruling on those questions of law must also be considered a final decision on the merits. Ordinarily, a ruling denying summary judgment will not be a final ruling on the merits. However, in this case, the Sixth Circuit accepted jurisdiction over the Warren defendants' appeal of the district court's qualified immunity finding on the theory that the issue was a collateral order that "conclusively determine[d] the disputed question." *Moldowan*, 578 F.3d at 368 (quoting *Will v. Hallock*, 546 U.S. 345, 349 (2006)). The Sixth Circuit's holding on defendant Ingles' claim of qualified immunity therefore was determined conclusively, as, necessarily, was the question whether police officers have a duty under *Brady* to disclose exculpatory information. Finally, there is no evidence to suggest that Ingles did not have a full and fair opportunity to litigate this issue, satisfying the fourth requirement.

### 2.

Even if collateral estoppel did not apply, however, the outcome of the motion would be the same. In arguing that counts IX, X, XI, and XII should be dismissed, Ingles repeats the arguments that the duty to disclose exculpatory information under *Brady v. Maryland*, 373 U.S. 83 (1963), does not extend to police officers, Ingles is entitled to qualified immunity, and there is not sufficient evidence to create a genuine issue of material fact as to whether defendant Ingles violated *Brady* by withholding exculpatory evidence. The plaintiff asserts, correctly, that the first two of these issues

-13-

were disposed of by the Sixth Circuit's decision in *Moldowan v. Warren*, 578 F.3d 351 (6th Cir. 2009), and that a genuine issue of material fact exists as to whether defendant Ingles committed a *Brady* violation.

When determining whether defendant Ingles was entitled to qualified immunity, the *Moldowan* court considered, first, whether a duty to disclose exculpatory information under *Brady* extends to police officers; second, whether such a duty was clearly established at the time of defendant Ingles's alleged *Brady* violation; and third, whether, construing the facts in the light most favorable to the plaintiff, the plaintiff could establish a violation of his constitutional rights. The court found that "the obligations imposed under *Brady* would be largely ineffective if [police and other law enforcement officers] had no responsibility to inform the prosecutor team about evidence that undermined the state's preferred theory of the crime." *Moldowan*, 578 F.3d at 378. Therefore, "because the police are just as much an arm of the state as the prosecution, the police inflict the same constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory information." *Id*. at 379. The court recognized that "the due process guarantees recognized in *Brady* also impose an analogous or derivative obligation on the police." *Id*. at 381.

The court then held that this obligation was clearly established on the date of Ingles's alleged *Brady* violation. The court found that other circuits had recognized the "*Brady*-derived" claim advanced by the plaintiff as early as 1964, and that "at least three circuits recognized prior to August 1990, the earliest possible date for Detective Ingles' involvement in the case, that this right was clearly established." *Id*. at 382. The court held that "the overwhelming number of decisions from other circuits recognizing this type of claim satisfies us that any reasonable police officer would

-14-

know that suppressing exculpatory evidence was a violation of the accused's constitutional rights." *Ibid.*

Finally, the court found, examining the facts in the light most favorable to the plaintiff, that the evidence withheld by defendant Ingles was exculpatory and the plaintiff could make out a claim of a *Brady* violation against defendant Ingles. *Ibid*. The Warren defendants argued, as they do here, that a showing of bad faith on the part of Ingles was required in order to prevail. *Ibid*. The court disagreed, holding that

> police actions taken in bad faith are not the only species of police conduct that can deprive criminal defendants of the due process guaranteed by the Constitution. We acknowledge that a number of courts, including the Supreme Court have held that a showing of bad faith is required to prevail on a claim that the police deprived a defendant of due process by concealing or withholding evidence that is only "potentially useful." But, where the police are aware that the evidence in their possession is exculpatory, the Supreme Court's decisions in this area indicate that the police have an *absolute* duty to preserve and disclose that information. The critical issue in determining whether bad faith is required thus is not whether the evidence is withheld by the prosecutor or the police, but rather whether the exculpatory value of the evidence is "apparent" or not. . . . In other words, the critical issue in determining whether government conduct deprived a criminal defendant of a fair trial is the nature of the evidence that was withheld; it emphatically is not the mental state of the government official who suppressed the evidence.

*Id.* at 383-84 (emphasis in original). The court found that, even if it believed that a showing of bad faith were required, there was sufficient evidence for a reasonable jury to find that Ingles acted in bad faith. *Id*. at 389. The court found that Ingles was not entitled to qualified immunity on the plaintiff's *Brady* claims. *Id*. at 401. All of those holdings apply with equal force to the present case, in which plaintiff Cristini is identically situated with Jeffrey Moldowan.

The Warren defendants now argue that the Sixth Circuit's *Moldowan* decision is inconsistent with the Supreme Court's subsequent decisions in *Ashcroft v. al-Kidd*, --- U.S. ---, 131 S. Ct. 2074 (2011), and *Connick v. Thompson*, --- U.S. ---, 131 S. Ct. 1350 (2011). However, they do not

-15-

explain how those decisions conflict with *Moldowan*. It is clear to the Court that neither decision calls *Moldowan* into question. *Al-Kidd* deals with a claim of qualified immunity in the context of a Fourth Amendment violation where the plaintiff alleged that a material witness warrant was used as a pretext to detain him. *Id*. at 2079. The Supreme Court overturned the lower courts' denial of qualified immunity; however, the decision has nothing to say about qualified immunity in the context of *Brady* violations by police officers. There is nothing in the decision to suggest that the Sixth Circuit's determination of the qualified immunity issue in *Moldowan* was in error. *Connick* deals with municipal liability for single instances of *Brady* violations and is thus relevant to the plaintiff's claims against the City of Warren based on defendant Ingles's conduct. However, it has nothing to do with *Brady* violations by police officers or with qualified immunity. There is nothing in either of the decisions cited by the Warren defendants to suggest that *Moldowan* was incorrectly decided.

Ingles argues that the record in this case could not support a finding of a *Brady* violation. According to *Moldowan*, in order to make out a claim for a violation of *Brady* by a police officer, the plaintiff must demonstrate (1) either that the suppressed evidence was apparently exculpatory or that the suppressed evidence was potentially exculpatory and the police acted in bad faith and (2) that the suppressed evidence was material. *Moldowan*, 578 F.3d at 383-84 ("The critical issue in determining whether bad faith is required thus is not whether the evidence is withheld by the prosecutor or the police, but rather whether the exculpatory value of the evidence is 'apparent' or not."); *Brady*, 373 U.S. at 87. Ingles contends that the evidence he allegedly suppressed — the statement by Burroughs that he had seen four black men surrounding the victim's naked body, one of whom kicked the victim, in the early morning hours of August 9, 1990, and the discussion he

-16-

overheard later — is neither apparently exculpatory nor material.  In the context of this entire episode, including the subsequent criminal trials, that cannot be so.

The Sixth Circuit has not yet articulated a test for determining whether an item of evidence is apparently exculpatory or merely potentially exculpatory.  *Elkins v. Summit County, Ohio*, 615 F.3d 671, 677 (6th Cir. 2010).  However, in *Moldowan*, the Sixth Circuit stated that "it is evident that Burroughs' statements cast serious doubt on, if not entirely discredit, Fournier's identification of Moldowan as one of her attackers, an issue that undoubtedly was one of the most important elements of the state's case.  Burroughs' statements thus should have been disclosed to the defense as they undoubtedly 'would tend to exculpate' Moldowan." *Moldowan*, 578 F.3d at 382 (quoting *Brady*, 373 U.S. at 88).  Those observations apply with equal force to plaintiff Cristini.

In *Elkins*, the court found that a statement that cast doubt on the identity of a victim's attacker was apparently exculpatory where the other evidence against the plaintiff was not strong.  Ingles argues that in contrast, the other evidence against Cristini was strong: an eyewitness identification by the victim and bite mark evidence that appeared to implicate the plaintiff.  However, in *Elkins*, the court also stated that "[w]hile we have never elucidated a test for determining what evidence is apparently exculpatory, there is no question that, in light of the broad range of evidence available to the officers at the time, the [exulpatory] statement 'cast serious doubt on, if not entirely discredit[ed Brooke's] identification of [Elkins].' *Moldowan,* 578 F.3d at 382.  *Even less would have been sufficient*."  *Elkins*, 615 F.3d at 677 (emphasis added).  This final statement indicates that a case as weak as that in *Elkins* is not necessary to find that a statement that calls into doubt a victim's identification is apparently exculpatory.  Further, in *Elkins*, the court found it important that the exculpatory statement "'might be expected to play a significant role in

-17-

[the plaintiff's] defense.'" *Ibid.* (quoting *Moldowan*, 578 F.3d at 388). Similarly, here, a statement directly implicating others in the attack on the victim could have been expected to play a significant role in the plaintiff's defense. There is little doubt that a jury could find that the withheld evidence was apparently exculpatory; *Elkins* does not foreclose that possibility.

Ingles also argues that a *Brady* violation does not occur unless the suppressed evidence is material and favorable to the accused, *Elmore v. Foltz,* 768 F.2d 773, 777 (6th Cir. 1985), and the evidence he withheld was not material as a matter of law. Again, that simply cannot be true. Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley,* 514 U.S. 419, 432-36 (1995). Material evidence is that which is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce." *United States v. Clark,* 988 F.2d 1459, 1467 (6th Cir. 1993). As the Supreme Court has stated, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 435.

In determining whether the evidence Ingles allegedly suppressed was material, the plaintiff's acquittal at a second trial in which the evidence was introduced looms large. Although the second trial also did not include disputed bite mark evidence, the fact that the plaintiff was acquitted in a trial that included the suppressed evidence is a strong indication of the materiality of that evidence. The Warren defendants argue that with the volume of evidence presented in the first trial, and the eyewitness and forensic evidence presented by the prosecution, the suppressed evidence could not have created a reasonable probability of a different result. However, as the Warren defendants

-18-

themselves emphasize, the victim's eyewitness identification was one of the key pieces, if not the key piece, of evidence in the case against the plaintiff.  Evidence that would tend to discredit that eyewitness identification would have been of paramount importance at trial.  Additionally, in *Moldowan*, the Sixth Circuit held that the issue of whether the plaintiff was prejudiced — that is, whether the allegedly suppressed evidence was material — "involve[d] disputed issues of fact." *Moldowan*, 578 F.3d at 389.  Ingles is not entitled to qualified immunity on counts IX, X, XI, and XII of the complaint.

### C.  Claims against the City of Warren

#### 1.  Liability for defendant Ingles's alleged *Brady* violation

The Warren defendants argue that counts XXII and XXIII, in which the plaintiff asserts that defendant the City of Warren is responsible for defendant Ingles's alleged *Brady* violations under either a failure to train or a final policymaker theory of liability, must be dismissed because there was no underlying constitutional violation, there is no evidence of deliberate indifference to the need for training, and defendant Ingles was not a final policymaker.  The plaintiff's contention that collateral estoppel precludes these argument is not well taken.  The Sixth Circuit merely held that there were factual issues concerning the adequacy of the City of Warren's training that were beyond the scope of the appeal.  *Moldowan*, 578 F.3d at 393 n.18.  Because that determination was based on a review of the record that construed the facts in light most favorable to Moldowan, *id*. at 370, it cannot be said that the prior proceeding resulted in a final judgment on the merits on this issue as required for collateral estoppel.  The plaintiff also responds that there are genuine issues of material fact on these claims that preclude summary judgment for the defendants.

-19-

a.  Failure to train

"A municipality is liable for a constitutional violation when execution of the municipality's policy or custom inflicts the alleged injury." *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978)).  The Sixth Circuit explained that "[t]he official policy or custom 'must be the moving force of the constitutional violation' to establish the liability of a government body."  *Ibid.* (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)).  The absence of a written policy endorsing the constitutional violation is not fatal to a claim.  "Section 1983[] 'authorizes suit "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."'" *Cash v. Hamilton Cnty. Dep't of Adult Probation*, 388 F.3d 539, 542-43 (6th Cir. 2004) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). To sustain municipal liability under that theory, a plaintiff must "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."  *Id.* at 543 (citation and quotation marks omitted).

As the Supreme Court recognized in *City of Canton, Ohio v. Harris,* 489 U.S. 378 (1989), a city can be held liable under section 1983 for failure to train its employees. To prevail, the plaintiff must show that the "training program is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Hill v. McIntyre,* 884 F.2d 271, 275 (6th Cir. 1989).  A municipality can be held liable for inadequate police training under section 1983 "only where the failure to train amounts to deliberate indifference to rights of persons with whom the

-20-

police come into contact." *City of Canton,* 489 U.S. at 388.  The mere fact that a few officers may be inadequately trained is not sufficient to demonstrate liability, as the shortcomings could be caused by officer inattention or poor administration. *Id.* at 391.  Allegations that the officers in question could have been better trained are also insufficient. *Ibid.*  Rather, the "failure to train [must] reflect[] a 'deliberate' or 'conscious' choice by a municipality." *Id.* at 389.  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for the purposes of failure to train." *Connick,* 131 S. Ct. at 1360 (quoting *Board of Cnty. Comm'rs of Bryan County, Olk. v. Brown*, 520 U.S. 397, 409 (1997)).

The Warren defendants have not pointed to any evidence that the City of Warren trained its police officers on avoiding *Brady* violations, beyond a statement in answer to the plaintiff's interrogatories that *Brady* standards are not taught in any formalized training but are discussed in the police academy and legal updates and may have been mentioned in some training sessions. Instead, the Warren defendants argue that the city cannot be said to have been deliberately indifferent to the need for such training.  Recently, the Supreme Court held in *Connick v. Thompson* that a single instance of a *Brady* violation by a prosecutor cannot support a finding of municipal liability on a failure to train theory, as a single violation would be insufficient to put a prosecutor's office on notice of the need for specific *Brady* training.  *Id*. at 1361.  The Warren defendants contend that *Connick* mandates the conclusion that the plaintiff's failure to demonstrate other, similar *Brady* violations by police officers in Warren is fatal to his claim.  However, the *Connick* decision relied on the fact that the alleged *Brady* violation was committed by a prosecutor, who was trained in the law and was "not only equipped . . . but also ethically bound to know what *Brady* entails and to perform legal research [if he was] uncertain." *Connick*, 131 S. Ct. at 1363.  The Court also relied

on the fact that it was "undisputed . . . that the prosecutors in [the defendant's] office were familiar with the general *Brady* rule." *Ibid*. The Court stated that the reason that a single-incident theory of liability was inapplicable in that case was "that attorneys, *unlike police officers*, are equipped with the tools to find, interpret, and apply legal principles." *Id*. at 1364 (emphasis added).

In contrast, here, the *Brady* violation allegedly was committed by a police officer who, unlike an attorney, presumably had no law school training or other occasion to become generally familiar with *Brady*. Nor is a police officer "equipped with the tools to find, interpret, and apply legal principles." *Ibid*. Because of those important differences, the Warren defendants' analogy to *Connick* is imperfect. Instead, the Court believes that *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), is a more appropriate rubric under which to evaluate the plaintiff's failure-to-train claim. *Canton* has been understood generally to stand for the proposition that a single instance of a constitutional violation may be sufficient to support municipal liability where the need for training is so obvious that the failure to provide it, even in the absence of a demonstrated pattern of violations, constitutes deliberate indifference. *See Connick*, 131 S. Ct. at 1361; *Bryan County*, 520 U.S. at 409. In *Canton*, the example of obviousness that the Court provides is the need to train officers in the constitutional limits on the use of deadly force. The Court reasoned that "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons" and the city has provided those officers with guns. *Canton*, 489 U.S. at 390 n.10. The circumstances of the present case are much closer to *Canton* than to *Connick*. Just as in the hypothetical advanced in *Canton*, city policymakers know to a "moral certainty" that at some point, their investigating officers will be confronted with evidence that contradicts a working investigative theory and tends to exonerate a prime suspect. Unlike the prosecutors in *Connick*, those officers

-22-

presumably are not generally familiar with *Brady*'s principles or equipped to do the necessary legal research to become familiar with those principles.  Although it is true that a potential *Brady* violation lacks the split-second, life-or-death immediacy of a decision to use deadly force, it is still the case that "[t]here is no reason to assume that police academy applicants are familiar with the constitutional [disclosure requirements under *Brady*].  And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require."  *Connick*, 131 S. Ct. at 1361. Further, the failure to disclose exculpatory information could have serious consequences, such as the conviction of an innocent person.  It cannot be gainsaid, therefore, that "there is an obvious need for some sort of training."  *Ibid.*

This analysis tracks Sixth Circuit authority.  The court has held that a plaintiff can survive summary judgment under *City of Canton* if he can show "that officer training failed to address the handling of exculpatory materials and that such a failure has the 'highly predictable consequence' of constitutional violations of the sort Plaintiff suffered. . . . Widespread officer ignorance on the proper handling of exculpatory materials would have the 'highly predictable consequence' of due process violations."  *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006).  Because the Warren defendants have presented no evidence to suggest that the City of Warren provided any formal training on *Brady* issues, the Court must deny the Warren defendants' motion for summary judgment on count XXII of the complaint.

### b.  Liability as policymaker

The Warren defendants further argue that the City of Warren cannot be held liable on the theory that Ingles was the final policymaker, as Michigan state law and local ordinances provide that the Warren Police Commissioner was the final policymaker for the police department and defendant

Ingles was embedded in a chain of command at all times during his investigation. The plaintiff did not respond specifically to that argument.

"A municipality may be liable under Section 1983 for actions of its authorized policymakers 'where — and only where — a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Adair v. Charter County of Wayne,* 452 F.3d 482, 493 (6th Cir. 2006) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986)). A policymaker is the final authority if his "'decisions are final and unreviewable and are not constrained by the official policies of superior officials.'" *Ibid.* (quoting *Waters v. City of Morristown,* 242 F.3d 353, 362 (6th Cir. 2001)). "Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker . . . ." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). A final policymaker is more than a final decisionmaker; a final policymaker is charged with the duty to "'formulate[] plans for the implementation of broad goals.'" *Miller v. Calhoun County,* 408 F.3d 803, 814 (6th Cir. 2005) (quoting *Hager v. Pike County Bd. of Educ.,* 286 F.3d 366, 376 (6th Cir. 2002)). "[T]he identification of policymaking officials is a question of state law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-26 (1988) (examining city charter to determine final policymaker on personnel administration issues).

The Warren defendants have provided ample evidence that defendant Ingles cannot be considered to have been a final policymaker. The Warren City Code states that "police officers" are "subject to such rules and regulations as the police commissioner shall promulgate" and are "under the direction, supervision, and control of the police commissioner." Warren City Code Sec. 26-16. Defendant Ingles testified at his deposition that he was acting under the supervision of a sergeant,

who reported to a lieutenant, who in turn was under the supervision of an inspector, who reported to the chief, who reported to the police commissioner.  It is difficult to see how Ingles could be considered a final policymaker.  The plaintiff has not disputed any of that evidence or come up with any of his own to the contrary.  The Court will grant the Warren defendants' motion for summary judgment on count XXIII of the complaint.

2.   Liability for defendant Schultz's destruction of evidence

The Warren defendants argue that the City cannot be liable under a *Monell* theory for Officer Schultz's destruction of evidence because the plaintiff cannot demonstrate an underlying constitutional violation and the plaintiff has neither presented evidence of a policy or practice of destroying evidence in violation of a court order nor identified a final policymaker responsible for ordering the destruction of evidence in this case.  The plaintiff responds  by citing deposition testimony by Officer Schultz that he was ordered to destroy this evidence.

The Sixth Circuit addressed this issue in *Moldowan*, when it observed that "the state violates a suspect's due process rights, regardless of the bad faith of the state actor, where material exculpatory evidence is not preserved."  *Moldowan*, 578 F.3d at 392.  The court also found that if the destroyed evidence were merely potentially useful, rather than material, the plaintiff had to show bad faith to make a case.  *Ibid*.  Although the court found that Moldowan could not maintain a claim against Officer Schultz, it noted that the plaintiff "may be able to show that the individual with final policy-making authority who directed . . . the destruction of the evidence was aware of the materiality of the evidence, and thus did violate [the plaintiff's] rights under *Trombetta* and *Youngblood*."  *Id.* at 394 n.20 (internal quotation marks omitted).  The court noted with concern that "[d]espite extensive discovery, Moldowan has yet to identify the individual responsible for ordering

-25-

the destruction of evidence"; the court nevertheless did not grant the defendants summary judgment on this issue because it evaluated the record in the light most favorable to Moldowan.  *Id.* at 394 n.219.

The plaintiff in this case points to testimony by Officer Schultz that he was given an order to destroy the evidence in this case by either a sergeant or detective.  However, Officer Schultz was unable to identify precisely who gave that order, and the plaintiff has not come up with any suggestion as to who it might have been.  In the absence of some identification of who ordered the destruction, it is difficult to see how the plaintiff can prove a final decision maker was the culprit. And if there is no clue on who gave the order, the plaintiff cannot demonstrate that the person knew that the evidence was material or destroyed it in bad faith.  The only evidence that the plaintiff has produced suggests that the individual who made the decision was likely not a final policymaker. Officer Schultz testified at his deposition that the person who ordered the destruction was a sergeant or a detective.  Those are not final policymakers for the Warren Police Department.  The plaintiff has not presented sufficient evidence for a reasonable jury to find that the individual responsible for the destruction of the evidence in this case was aware of the materiality of the destroyed evidence, was acting in bad faith if the evidence was not material, or was a final policymaker for the City of Warren.  The Court will grant the Warren defendants' motion for summary judgment on count XXIV.

3.  Warren's liability for the plaintiff's house arrest and second prosecution

The Warren defendants argue that the plaintiff's claims arising out from his house arrest and second prosecution should be dismissed because there is no evidence that the City was involved in

the decision to keep the plaintiff under house arrest or to retry him.  The plaintiff did not respond to this argument.

As the Sixth Circuit has stated, one element of such a Fourth Amendment malicious prosecution claim is that "the defendant 'ma[d]e, influence[d], or participate[d] in the decision to prosecute." *Sykes v. Anderson*, 625 F.3d 294,  308 (6th Cir. 2010) (quoting *Fox v. DeSoto*, 489 F.3d. 227, 237 (6th Cir. 2007)) (alteration in original).  In the absence of any evidence that a defendant participated in the *decision* to detain or prosecute the plaintiff, the plaintiff cannot prevail on a Fourth Amendment malicious prosecution claim against that defendant.  It is not necessary that the defendant himself make the decision to prosecute the plaintiff; however, "[t]o be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids the decision, as opposed to passively or neutrally participating." *Id*. at 308 n.5.  Although a malicious prosecution claim may be sustained where an officer supplies false information to establish probable cause, "an officer will not be deemed to have commenced a criminal proceeding against a person when the claim is predicated on the mere fact that the officer turned over to the prosecution the officer's *truthful* materials." *Id.* at 313-14.

Warren detective Mark Christian testified that although he was the officer assigned to the Moldowan case after the convictions were overturned, he was not asked to reassess probable cause and the decision to retry the plaintiff was made before the case was assigned to him.  Detective Christian explained that his role as the officer in charge was to act as a liaison between the prosecutor and the police department and to locate witnesses and evidence to be used at trial.  The plaintiff has not identified any evidence that the City or Detective Christian participated in the decision to place the plaintiff under house arrest or to retry the plaintiff, much less that the City

-27-

participated in such a way that "aided" the decision. Nor has the plaintiff alleged that the City or any of its police officers either fabricated or suppressed evidence at the plaintiff's *second* trial. The plaintiff's failure to present even a "scintilla" of evidence to support its claim of liability against defendant the City of Warren on counts XXV, XXVI, and XXVII requires that they be dismissed.

### D. Statute of limitations

The Warren defendants argue that the plaintiff's *Brady* claims and the claim against the City of Warren based on the destruction of evidence are barred by the three-year statute of limitations for tort claims in Michigan. The plaintiff agrees that a three-year statute of limitations applies in this case. The question presented by the motion, therefore, is when the plaintiff's claims accrued. The Warren defendants argue that the plaintiff's claims accrued on the date that his first conviction was vacated, October 20, 2003; the plaintiff contends that his claims accrued on the date of his acquittal, April 8, 2004.

The date on which a section 1983 claim accrues is determined by reference to federal law and in accordance with common-law tort principles. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). "Under those principles, it is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." *Ibid.* (internal citations, quotations marks, and brackets omitted). That rule was complicated, however, by the Court's earlier decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), in which the Court held that "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Id.* at 489-90. The conviction is invalidated when it "has been reversed on direct appeal, expunged by executive order, declared

-28-

invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id*. at 487.

The plaintiff calls his continued detention and seizure without probable cause the "crux" of his claim against the Warren defendants and argues that therefore his claim should not be considered to have accrued until the date of his acquittal on April 8, 2004. Plainly, the plaintiff's claims against the Warren defendants based on his detention and second prosecution after his first conviction was vacated hinge on the plaintiff's alleged continued detention without probable cause. *See Sykes*, 625 F.3d at 308-09. The Warren defendants insist, however, that the plaintiff's claims based on *Brady* violations accrued on October 20, 2003, when the Macomb County circuit court granted the plaintiff's motion for relief from judgment and ordered a new trial. Because the present lawsuit was not filed until March 15, 2007, the Warren defendants argue, it was filed out of time.

The Warren defendants reason that once the state court granted the plaintiff a new trial, any bar imposed by *Heck* dissipated, because the plaintiff's prior conviction that may have resulted from failure to disclose exculpatory evidence "ha[d] been invalidated." However, the plaintiff points out that he is required to demonstrate the materiality of the withheld evidence, which could not have been accomplished in the absence of his subsequent acquittal, and certainly was doomed to failure if he had been convicted at a second trial when the withheld evidence was introduced.

Certainly, the plaintiff must establish that the withheld evidence was material to the question of his guilt. *See Bagley,* 473 U.S. at 682; *see also Kyles,* 514 U.S. at 432-36. And the result of the second trial would assist him in that pursuit immeasurably. But even if the plaintiff conceivably could make out a *Brady* claim without the benefit of his subsequent acquittal, and the Court were

to accept the Warren's defendant's premise that the *Brady* claims accrued before the plaintiff was ultimately acquitted, the statue of limitations would not bar the *Brady* claim in this case.

   *Heck* makes clear that a plaintiff cannot assert all the elements of a claim based on an unconstitutional conviction or sentence until that conviction has been invalidated somehow once and for all.  The trial court's order vacating the plaintiff's conviction and granting him a new trial certainly satisfies that requirement, but that order did not become final until the time for a prosecution appeal expired.  *Cf. Gonzalez v. Thaler*, --- U.S. ---, ---, 132 S. Ct. 641, 653 (2012) (citing *Clay v. United States*, 537 U.S. 522, 527 (2003), and *Jimenez v. Quarterman*, 555 U.S. 113, 120-21 (2009)).  Until that time, the conviction was subject to reinstatement by the Michigan courts, and *Heck*'s bar had not been extinguished.  If the prosecutor had appealed, no new trial could have proceeded.  *See People v. George*, 399 Mich. 638, 250 N.W.2d 491 (1977).  Under Michigan law, the prosecutor had six months to appeal that order to the state court of appeals.  *See* Michigan Court Rule 2.705(F)(3).  Therefore, the order vacating the conviction did not become a final order until six months after it was entered, which was April 20, 2004.  Accepting the Warren defendants' arguments, the plaintiff's *Brady* claim would not have accrued any earlier than that.  The commencement of the lawsuit on March 15, 2007 was timely under the applicable three-year statute of limitations for section 1983 claims.  *McCune v. City of Grand Rapids*, 842 F.2d 903, 905 (6th Cir. 1988).  The Court finds that the defendants are not entitled to summary judgment on statute of limitations grounds.

III.

   The Court finds that the Warren Police Department is not a discrete entity capable of being sued and it will be dismissed from the case.  Defendant Ingles is not entitled to qualified immunity.

-30-

The City of Warren can be held liable under a failure-to-train theory, but it cannot be held liable for the actions of Ingles as a final policy maker. Similarly, the City cannot be held liable for Michael Schultz's destruction of evidence. The Warren defendants can have no liability for conduct related to the States's second prosecution of the plaintiff. The statute of limitations does not bar the plaintiff's claims against the Warren defendants.

Accordingly, it is **ORDERED** that the motion for summary judgment by defendants Donald Ingles, Michael Schultz, Warren Police Department, and City of Warren [dkt. #95] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the motions for summary judgment by defendants Macomb County Prosecutor, County of Macomb, and Alan Warnick [dkt. #97, 100] are **DISMISSED AS MOOT**.

It is further **ORDERED** that defendant Alan Warnick's motion *in limine* [dkt. #98] is **DISMISSED AS MOOT**.

It is further **ORDERED** that counts XXIII through XXVII of the complaint are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that counsel for the parties shall appear before the Court for a status conference on **December 17, 2012 at 3:00 p.m.** to schedule the case for trial.

s/David M. Lawson                     
DAVID M. LAWSON
United States District Judge

Dated:  November 14, 2012

-31-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 14, 2012.

s/Deborah R. Tofil
DEBORAH R. TOFIL